24CA1827 Hayek v Herron 08-13-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1827
Routt County District Court No. 20CV30070
Honorable Michael A. O'Hara III, Judge

Cynthia Hayek,

Plaintiff-Appellee,

v.

Christine Herron,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LIPINSKY
Yun and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 13, 2026

Fairfield and Woods, P.C., Michael R. McCurdy, Lee Katherine Goldstein, Jason B. Robinson, Denver, Colorado, for Plaintiff-Appellee

Crisham & Holman LLC, John K. Crisham, David C. Holman, Littleton, Colorado, for Defendant-Appellant

¶ 1     Christine Herron (stepmother) appeals the judgment entered against her in this civil action premised on allegations that she and her husband, Steven Karl Herron (father), falsely accused father's ex-wife, Cynthia Hayek (mother), and her boyfriend, Kenneth Wayne Hamp, of child abuse.  (We refer to stepmother and father, jointly, as the Herrons).  At the conclusion of the trial in this case, the jury found stepmother liable to mother for outrageous conduct and conspiracy and awarded mother $1,000,000 in noneconomic damages.

¶ 2     We affirm the judgment.

## I.     Background

¶ 3     A court dissolved mother and father's marriage in 2016.  They had three children together: a daughter, E.H., and twin sons, J.1.H. and J.2.H. (collectively, the children).  Mother and father shared equal parenting time following the dissolution of their marriage.

¶ 4     Mother began a relationship with Hamp in May 2018.

### A.     The Department of Human Services Investigation

¶ 5     The jury's verdict was consistent with the following evidence introduced at trial.

1

¶ 6     In September 2019, after spending a week with mother and Hamp, J.1.H., who was nine years old at the time, told his paternal grandmother and father that Hamp had hurt him in his rectal area by giving him a "wedgie." Paternal grandmother and father separately examined the area that J.1.H. said hurt and concluded that it appeared sore and possibly bruised. Both J.1.H. and J.2.H. described, among others, incidents in which Hamp twisted their nipples, removed a "little rock" from J.2.H.'s penis, and discussed "hickeys," "wet dreams," and masturbation with them.

¶ 7     On September 23, Dr. Sheila Fountain, the children's pediatrician, examined J.1.H. at father's request. J.1.H. told Dr. Fountain that Hamp had given him a hard wedgie. Dr. Fountain concluded that there may have been several causes of J.1.H.'s rectal injury, including minor physical trauma, constipation, or other issues that warranted further evaluation. She consulted with Patti Oakland, a child abuse specialist, who recommended that J.1.H. be assessed at a child advocacy center. Dr. Fountain also contacted Camilla Haight, the child welfare supervisor at the Routt County Department of Human Services (Routt County DHS), and a

nurse in Dr. Fountain's office filed a mandatory child abuse report with the Routt County DHS.

¶ 8     On September 25, the Herrons took the children to a child advocacy center, where the boys participated in forensic interviews observed by Haight and Detective Jordan Cyphers of the Steamboat Springs Police Department. Following the interviews, Haight, Detective Cyphers, and the center's director informed father that they believed "something had happened to the boys." They advised him to continue validating the children's experiences and reassure "them that [he] believed them." Haight, Cyphers, and the director noted that J.1.H. might share more information about the cause of his injury as he became more comfortable doing so.

¶ 9     The following day, Haight and Detective Cyphers met with the Herrons. During the meeting, the Herrons explained their understanding of the cause of J.1.H.'s injuries and recounted what they believed were Hamp's and mother's inappropriate actions toward the children.

¶ 10    After a lengthy investigation, the Routt County DHS determined that Hamp had sexually and physically abused J.1.H. and that mother had emotionally abused the children. The Routt

3

County DHS's finding of sexual abuse was based on J.1.H's "disclosure about [Hamp] coming into the room in the middle of the night and shoving something in his butt." The physical abuse finding was premised on the nature of J.1.H.'s injury and his account that it resulted from a forceful wedgie. And the emotional abuse finding was based on mother's actions after J.1.H. reported the incident to father, including directing J.1.H. to create a "shrine" in support of Hamp and to reenact the events to get him to change his story.

## B.    The Criminal Investigation

¶ 11    The local district attorney's office investigated Hamp's conduct toward J.1.H. Hamp was arrested on September 30, 2019, and charged with misdemeanor child abuse based on the reported wedgie. The district attorney decided to charge Hamp after Detective Cyphers filed an affidavit documenting her observations from J.1.H.'s September 25 interview. The district attorney's office later elevated the charge against him to child abuse resulting in serious bodily injury, a class 3 felony.

¶ 12    The district attorney later concluded, however, that his office could not prove the charges against Hamp beyond a reasonable doubt, and the criminal case was dismissed on June 1, 2020.

### C.    The Domestic Relations Case

¶ 13    At the same time that the Routt County DHS and the district attorney's office were investigating Hamp, father and mother were embroiled in a contentious custody dispute.

¶ 14    On October 1, 2019, the day after Hamp's arrest, father filed a motion in the parties' pending domestic relations case to suspend mother's unsupervised parenting time (the October motion).  The domestic relations court granted the October motion two days later.

¶ 15    Although mother filed multiple motions to reinstate her parenting time, including a motion filed on February 17, 2020 (the February motion), the domestic relations court denied each one.  In its August 22, 2020, order (the August 2020 order) denying the February motion, the court also found that father had not engaged in parental alienation, as mother had alleged.

### D.    The Civil Lawsuits

¶ 16    In September 2020, Hamp filed a lawsuit against father alleging that, in September 2019, father falsely told J.1.H. that

Hamp had sexually abused him. Hamp further claimed that father made false reports of child abuse to law enforcement officers, investigators, and others to secure Hamp's arrest and criminal prosecution and to gain an advantage over mother in the domestic relations proceedings.

¶ 17    In September 2021, mother filed a separate lawsuit against the Herrons, asserting claims of: (1) outrageous conduct; (2) abuse of process; (3) civil conspiracy; (4) malicious prosecution; and (5) negligent infliction of emotional distress.

¶ 18    Father filed a defamation action against mother. The court consolidated the three cases.

### E.    The Issue Preclusion and Summary Judgment Orders

¶ 19    In July 2023, stepmother filed a motion for summary judgment on mother's claims, arguing that the claims were barred by the immunity and presumption of good faith provisions of section 19-3-309, C.R.S. 2025, and by claim and issue preclusion.

¶ 20    On October 15, 2023, the trial court entered an order (the preclusion order) addressing the preclusive effect of a ruling the domestic relations court made from the bench on August 20, 2020, and the August 2020 order, which documented that oral ruling.

The trial court concluded that, under the issue preclusion doctrine, the domestic relations court's findings in its oral ruling and the August 2020 order barred mother's claims against father arising from his pre-August 2020 conduct. Those findings did not refer to stepmother, who was not a party to the domestic relations case, nor did they address stepmother's conduct.

¶ 21    The trial court rejected stepmother's claim preclusion and issue preclusion arguments. The court found that "her conduct was neither actually litigated nor necessarily decided" in the domestic relations case and that the domestic relations court made no findings related to stepmother's alleged misconduct.

¶ 22    The court entered a separate order granting summary judgment in favor of stepmother on mother's abuse of process, malicious prosecution, and negligent infliction of emotional distress claims; denying summary judgment to stepmother on the outrageous conduct and conspiracy claims; and declining to reach stepmother's section 19-3-309 immunity argument.

## F.    The Jury Verdict

¶ 23    In November 2023, following a twenty-two-day trial, the jury returned a verdict in favor of mother.  The jury awarded mother $1,000,000 in noneconomic damages against stepmother.

¶ 24    The jury found, among other facts, that stepmother had conspired with father by "creating and disseminating personally, or through others, one or more known false reports of child abuse or neglect to others — including but not limited to, health care providers, Routt County DHS, law enforcement agencies and the courts" to "gain sole parenting time with the children or otherwise limit or control [mother]'s parenting time with the children."  (The jury also awarded substantial damages against father.  Father appealed the verdict but stipulated to dismissal of his appeal after it was fully briefed.)

## G.    Post-Trial Proceedings

¶ 25    In January 2024, stepmother filed motions challenging the noneconomic damages award entered against her and seeking judgment notwithstanding the verdict (JNOV).  That same day, mother filed a motion to increase the amount of noneconomic

damages awarded against stepmother. (We refer to these filings collectively as the post-trial motions.)

¶ 26    In July 2024, the court issued an "Order on Motions Regarding Noneconomic and Punitive Damages[,] Order Denying Defendants' Motions for [JNOV,] Order Vacating Stay and Entering Judgment[, and] Order Determining Prevailing Parties" (the post-trial order).

¶ 27    The court denied mother's request to increase the jury's award of $1,000,000 in noneconomic damages against stepmother.

## H.    The Appeal

¶ 28    In this appeal, stepmother contends that (1) the trial court erred by failing to instruct the jury on section 19-3-309, as the jury should have determined whether she was entitled to statutory immunity; (2) the domestic relations court's findings barred mother's claims against her under the doctrine of issue preclusion; (3) section 19-3-309 and issue preclusion barred mother's conspiracy claim; and (4) the trial court applied an incorrect version of the statutory cap to mother's noneconomic damages and awarded mother noneconomic damages in excess of the correct cap amount.

## II.    Analysis

### A.    The Trial Court Correctly Concluded That Stepmother Was Not Entitled to Immunity Under Section 19-3-309

¶ 29    Stepmother contends that the trial court reversibly erred by failing to instruct the jury on immunity under section 19-3-309.  In addition, she contends that the trial court erred by failing to determine that she was immune from liability under the statute.  We disagree.

### 1.    Standard of Review

¶ 30    Statutory interpretation raises questions of law, which we review de novo.  *People v. Sprinkle*, 2021 CO 60, ¶ 12, 489 P.3d 1242, 1245.  When interpreting a statute, we begin "by looking to the language of the statute, giving its words and phrases their plain and ordinary meanings."  *People in Interest of J.D.*, 2025 CO 14, ¶ 11, 567 P.3d 138, 141.  "That meaning may be informed by the canon of statutory interpretation *expressio unius est exclusio alterius* — 'the inclusion of certain items implies the exclusion of others.'"  *People in Interest of B.H.*, 2022 COA 9, ¶ 7, 507 P.3d 1089, 1091 (quoting *In Interest of M.K.D.A.L.*, 2014 COA 148, ¶ 5, 410 P.3d 559, 560).  We "consider the entire statutory scheme to give

consistent, harmonious, and sensible effect to all of its parts." *Colo. State Bd. of Educ. v. Brannberg*, 2023 CO 11, ¶ 15, 525 P.3d 290, 293. Courts cannot "add words to the statute or subtract words from it." *Id.* "If the statutory language is unambiguous, then we must apply it as written, and we need not resort to other rules of statutory construction." *Id.* at ¶ 16, 525 P.3d at 293.

### 2. Section 19-3-309

¶ 31 We begin by considering the categories of persons eligible for immunity under section 19-3-309 and determining whether stepmother fell into one of those categories.

#### a. Eligibility for Immunity Under Section 19-3-309

¶ 32 Section 19-3-309 specifies the persons who are entitled to immunity from "liability, civil or criminal, or termination of employment that otherwise might result by reason of" participating in good faith in the specified "acts of participation." As relevant to this appeal, one such "act of participation" is "the facilitation of the investigation of . . . a report[] or [involvement] in a judicial proceeding held pursuant to" the Children's Code, §§ 19-1-101 to -7-315, C.R.S. 2025. § 19-3-309.

¶ 33    Article 3 of the Children's Code establishes a child abuse reporting system. *See* § 19-3-302, C.R.S. 2025. The reporting procedures are specified in section 19-3-307, C.R.S. 2025. Consistent with article 3's purposes, *see* § 19-3-302(1), we interpret "making of a report" in section 19-3-309 to mean following the reporting procedures outlined in section 19-3-307.

¶ 34    Because section 19-3-309 does not define "facilitation" or "facilitating," we turn to their dictionary definitions. "Facilitation" means "the act of facilitating: the state of being facilitated." Merriam-Webster Dictionary, https://perma.cc/H6D6-DCZH. "Facilitating" means "make[ing] (something) easier," "help[ing] bring (something) about," or "help[ing] (something) run more smoothly and effectively." Merriam-Webster Dictionary, https://perma.cc/YY35-24Y5. Thus, a person may be entitled to immunity as a facilitator under section 19-3-309 if the person made it easier, or helped bring about, the reporting of known or suspected child abuse or neglect.

### b.    Good Faith

¶ 35    A person who participates in facilitating the investigation of a report of known or suspected child abuse or neglect is not

automatically entitled to immunity under section 19-3-309, however. A person is not entitled to immunity under the statute if the person did not act in good faith or if "a court of competent jurisdiction determines that [the] person's behavior was willful, wanton, and malicious." § 19-3-309.

¶ 36 Although section 19-3-309 does not define "good faith," a division of this court explained that the term means "a state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or seek unconscionable advantage." *Credit Serv. Co. v. Dauwe*, 134 P.3d 444, 447 (Colo. App. 2005) (quoting Black's Law Dictionary 713 (8th ed. 2004)).

¶ 37 Section 19-3-309 also provides that certain persons are entitled to a presumption of good faith. It specifies that "any such person reporting child abuse, any such person taking photographs or X rays, and any such person who has legal authority to place a child in protective custody" is entitled to the presumption. § 19-3-309. But the presumption does not apply to facilitators, as

they are not mentioned in the clause addressing the presumption. *Id.*

¶ 38    Because a facilitator is not entitled to the presumption of good faith, a facilitator who seeks statutory immunity bears the burden of proving that she acted in good faith. *See Atl. & Pac. Ins. Co. v. Barnes*, 666 P.2d 163, 165 (Colo. App. 1983) ("[A]s a general rule, the burden of proof rests upon the party who asserts the affirmative of an issue."). If a facilitator fails to meet this burden, the facilitator is not entitled to immunity under section 19-3-309.

c.    Lack of Statutory Good Faith Presumption for Facilitators Under Section 19-3-309

¶ 39    Stepmother's argument regarding the jury instruction hinges on her assertion that she was a facilitator. At oral argument, stepmother's counsel conceded that, despite stepmother's arguments in the trial court, she was not a "reporter" for purposes of section 19-3-309.

¶ 40    We disagree with stepmother that she was entitled to the statutory presumption of good faith because she was a "facilitator" — a category of persons not listed in the sentence of the statute addressing the presumption. *See* § 19-3-309. And while we

14

agree that stepmother was entitled to a jury instruction on whether she acted in good faith for purposes of section 19-3-309 immunity, as discussed *infra* Part II.A.3, we conclude that the trial court's failure to give such an instruction was harmless error.

¶ 41 Evidence at trial showed that stepmother prepared the children for their interviews with the Routt County DHS representatives, provided DHS officials and law enforcement officers with photographs and statements about the alleged abuse, and recorded conversations with the children regarding Hamp's alleged abusive conduct. Those actions "facilitated" Dr. Fountain's report to the Routt County DHS and aided the resulting investigation.

¶ 42 Because stepmother was a facilitator for purposes of section 19-3-309, she was not entitled to the presumption of good faith, for the reasons noted above. And because she was not entitled to the presumption, she needed to prove that she acted in good faith.

### 3. Jury Argument

¶ 43 Stepmother argues that the trial court erred by failing to instruct the jury that she was a person "reporting or facilitating an investigation of child abuse." However, this argument is based on the mistaken assumption that the good faith presumption extended

to her. As explained above, it does not. But we agree with stepmother that the trial court should have allowed the jury to determine whether she acted in good faith.

### a. Legal Standard

¶ 44 Whether a person acted in good faith is a question of fact for the jury to determine. *See, e.g.*, *Goodboe v. Gabriella*, 663 P.2d 1051, 1054-55 (Colo. App. 1983) (concluding that "it was for the jury to decide whether these defendants acted in good faith," thereby entitling the defendants to statutory immunity). "Trial courts have a duty to correctly instruct juries on all matters of law." *Banning v. Prester*, 2012 COA 215, ¶ 9, 317 P.3d 1284, 1287. "Prejudicial error in an instruction exists when the record shows that a jury might have answered differently if a proper instruction had been given." *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375, 1378 (Colo. App. 1996). Such an error is harmless, however, if "[t]he jury's rejection of [a] defense necessarily was predicated on a determination that another element had not been shown." *Xerox Corp. v. ISC Corp.*, 632 P.2d 618, 622 (Colo. App. 1981).

b.    The Trial Court's Instructional Error Was Harmless

¶ 45    We hold that the trial court's error in not allowing the jury to determine whether stepmother acted in good faith was harmless because, in light of the jury's verdict and findings regarding stepmother's conduct, the jury could not have found that stepmother acted in good faith under section 19-3-309.

¶ 46    Specifically, the jury's findings on mother's outrageous conduct and conspiracy claims against stepmother established that stepmother did not act in good faith.

¶ 47    The jury found that

- stepmother was liable for outrageous conduct, meaning that she engaged in "conduct that [wa]s so outrageous in character, and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community"; and

- stepmother was liable for conspiracy because she attempted to gain sole parenting time through unlawful means, including "creating and disseminating personally,

17

or through others, one or more known false reports of child abuse or neglect."

¶ 48 The evidence introduced at trial supported the jury's verdict. It showed, for example, that stepmother

- admitted that, during and after the Routt County DHS proceedings, she and father worked as a "team" in pursuit of his goal of obtaining full custody of the children;

- influenced J.1.H. before his May 2020 forensic interviews, including suggesting to him that Hamp had drugged him;

- drafted a statement for a witness that the witness denied ever giving and provided authorities with another witness statement that the witness never reviewed;

- secretly recorded a meeting with the district attorney and disclosed only selected portions of the recording, omitting the district attorney's explanation of how father's actions negatively impacted the investigation into Hamp; and

- asked the district attorney whether destroying her notes would strengthen the criminal case against Hamp.

18

¶ 49　The jury's verdict and the evidence introduced at trial thus demonstrate that, even if the trial court had instructed the jury on section 19-3-309's good faith requirement, the jury could not have concluded that stepmother acted honestly and without the "intent to defraud or seek unconscionable advantage." *Dauwe*, 134 P.3d at 447. For this reason alone, stepmother is not entitled to immunity under section 19-3-309.

¶ 50　But even assuming that the trial court was also required to determine whether stepmother acted "willfully, wantonly, and maliciously," both the verdict and the evidence demonstrate that stepmother did so. "Willful and wanton conduct" is "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Dauwe*, 134 P.3d at 447 (quoting section 13-21-102(1)(b), C.R.S. 2025, the exemplary damages statute, in interpreting section 19-3-309). In other words, the conduct must be undertaken with an "evil motive." *Id.* at 448. And "malicious conduct" means actions taken "without an objective basis for believing" that the accused person engaged in child abuse. *Id.*

¶ 51    Stepmother acted willfully, wantonly, and maliciously by actively supporting and participating in father's orchestrated campaign to encourage J.1.H. to make false reports concerning physical and sexual abuse by Hamp and emotional abuse by mother, all in furtherance of father's goal to restrict mother's parental rights.

¶ 52    Thus, even if the trial court erred by not instructing the jury regarding section 19-3-309, the error was harmless.

### 4.    The Trial Court Did Not Err by Determining that Stepmother Was Not Entitled to Section 19-3-309 Immunity

¶ 53    We next turn to stepmother's contention that the court erred by failing to rule on her immunity argument.  We disagree.

¶ 54    In the post-trial order, the court expressly, but summarily, denied stepmother's JNOV motion, in which she argued, in part, that she was immune from liability as a facilitator under section 19-3-309.  Although the court did not explain its reasons for denying the motion, we hold that it correctly denied stepmother's immunity request.  *See Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004) (holding that an appellate court "may affirm the trial court's ruling based on any

20

grounds that are supported by the record"). As previously explained, the evidence and the jury's verdict establish that stepmother did not act in good faith and was therefore not entitled to statutory immunity.

¶ 55 Although a trial court's order "must contain findings of fact and conclusions of law sufficient to give an appellate court a clear understanding of the basis of its decision," *In re Estate of Sky Dancer,* 13 P.3d 1231, 1233 (Colo. App. 2000), the court's denial of stepmother's JNOV motion without explanation does not mean that the court did not rule on stepmother's section 19-3-309 argument. It did so — albeit summarily — in the post-trial order.

¶ 56 Contrary to stepmother's suggestion, before determining her entitlement to statutory immunity, the court was not required to make a specific finding that she acted willfully, wantonly, and maliciously while facilitating the child abuse investigation. The two cases she cites in support of this argument — *Dauwe* and *L.S.S. v. S.A.P.,* 2022 COA 123, ¶ 5, 523 P.3d 1280, 1283 — both of which involved "reporters," are inapposite.

¶ 57 *Dauwe* concerned a psychiatrist who reported suspected child abuse to a department of social services. The division noted that

the psychiatrist was presumed to have acted in good faith in making his report. *See Dauwe*, 134 P.3d at 447. The central issue in that case was whether the plaintiff, who was challenging the psychiatrist's entitlement to section 19-3-309 immunity, had provided sufficient evidence of the psychiatrist's willful, wanton, and malicious actions to defeat the psychiatrist's summary judgment motion. The division concluded that neither the plaintiff's pleadings nor his "materials presented on the summary judgment motion" were sufficient to "present a disputed issue of material fact." *Id.* at 448-49. Not only does this case not involve the summary judgment standard, but as explained above, stepmother was not entitled to the good faith presumption.

¶ 58 Stepmother's second case concerned claims arising from a mother's report to her child's therapist that the child's father had sexually abused the child. *See L.S.S.*, ¶¶ 6-11, 523 P.3d at 1283-84. The father brought defamation claims against the mother, who filed a special motion to dismiss the claims under section 13-20-1101, C.R.S. 2025 — the anti-strategic lawsuit against public participation statute. *See L.S.S.*, ¶ 2, 523 P.3d at 1283. As in *Dauwe*, the division recognized that a person who

22

reports child abuse is presumed to act in good faith under section 19-3-309. The key issue, as in *Dauwe*, was whether the plaintiff father had overcome the defendant mother's presumed good faith in making the report by establishing that the mother had made it willfully, wantonly, and maliciously.

¶ 59  Contrary to stepmother's assertion, neither *Dauwe* nor *L.S.S.* addressed the type of findings that a trial court must make to determine whether a person acted in good faith under section 19-3-309 when, as here, the presumption of good faith does not apply. When the presumption does not apply, the person is not entitled to statutory immunity if the record demonstrates that the person did not act in good faith. As explained above, if the person did not act in good faith, the court need not separately determine whether the person also acted willfully, wantonly, and maliciously.

¶ 60  In sum, because stepmother was not entitled to the statutory presumption of good faith, the trial court was not required to find that her actions were willful, wanton, and malicious before it could conclude, as a matter of law, that she was not entitled to immunity under section 19-3-309. As explained *supra* Part II.A.2, the jury verdict and the evidence established that stepmother did not act in

good faith and, therefore, was not entitled to section 19-3-309 immunity.

### B. The Trial Court Correctly Rejected Stepmother's Issue Preclusion Argument

#### 1. Standard of Review

¶ 61 We review de novo a trial court's rulings on summary judgment motions, *Garcia v. Centura Health Corp.*, 2020 COA 38, ¶ 11, 490 P.3d 629, 633, and JNOV motions, *Int'l Network, Inc. v. Woodard*, 2017 COA 44, ¶ 8, 405 P.3d 424, 428. In addition, "[i]ssue preclusion is a question of law that we review de novo." *Stanton v. Schultz*, 222 P.3d 303, 307 (Colo. 2010).

#### 2. Stepmother Waived Any Challenge to the Jury's Consideration of Father's Pre-August 2020 Conduct

¶ 62 As an initial matter, we agree with mother that stepmother waived any argument that the trial court should not have allowed the jury to consider father's pre-August 2020 conduct when evaluating the claims against stepmother.

¶ 63 At the Herrons' request, and over mother's objection, the trial court consolidated Hamp's and mother's respective claims. At trial, evidence of father's false statements to J.1.H., Routt County DHS representatives, and law enforcement, and stepmother's role in

24

those statements, was admissible to prove Hamp's claims *against father*. Stepmother did not request a limiting instruction before the jury heard such evidence. (The preclusion order did not, as stepmother claims, bar all evidence concerning the allegedly false narrative.)

¶ 64　As a general principle, counsel, and not the trial court, bears responsibility for determining whether a limiting instruction is appropriate. *See O'Neal v. Reliance Mortg. Corp.*, 721 P.2d 1230, 1233 (Colo. App. 1986) (citing CRE 105 and explaining that, "if [the] defendant desired such a limiting instruction, it was incumbent upon [the defendant] to request that type of instruction at trial"). Under CRE 105, "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.)

¶ 65　Stepmother included a proposed jury instruction addressing this issue in her preliminary instructions:

> You are instructed that with respect to
> [mother]'s claims, a court has already
> determined that as of August 2020, [father]

had not engaged in parental alienation, nor did he make up or coach the boys' allegations of abuse. For this reason, you must disregard any evidence of conduct relating to parental alienation or coaching that occurred prior to August 2020.

But she did not include this proposed instruction in her final set of instructions. And stepmother did not ask the trial court to consider the proposed instruction at the jury instruction conference. For these reasons, she waived this issue for appeal. *See* C.R.C.P. 51 (requiring parties to tender objections or alternative jury instructions to the court); *Devenyns v. Hartig*, 983 P.2d 63, 70 (Colo. App. 1998) (holding that, although the evidence might have supported an alternative version of a pattern instruction, the trial court had no obligation to give the unrequested alternative); *Mobell v. City & County of Denver*, 671 P.2d 433, 435 (Colo. App. 1983) (declining to address an argument that the trial court should have instructed the jury on the negligence of a third party and apportionment of damages when the defendant did not request such an instruction).

¶ 66     We further note that the lack of an instruction regarding the relevance of father's pre-August 2020 conduct to mother's claims

against stepmother did not mean that the court improperly instructed the jury on the law. *See Garhart v. Columbia/HealthONE, L.L.C.*, 95 P.3d 571, 587 (Colo. 2004).

¶ 67    Lastly, even if mother had used evidence of father's pre-August 2020 conduct to support her claims against stepmother, it was stepmother's, and not mother's, responsibility to request a limiting instruction or to object to any jury instruction regarding that conduct. *See O'Neal*, 721 P.2d at 1233.

¶ 68    In sum, stepmother cannot now assert that the trial court erred by failing to rely on the preclusion order to limit mother's claims against her.

### 3.    The Trial Court Properly Ruled That Issue Preclusion Does Not Apply

¶ 69    Stepmother asserts that the trial court erred by denying her motion for summary judgment based on the preclusive effect of orders entered in the domestic relations case. We disagree.

¶ 70    Issue preclusion applies only when "[t]he issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding." *Nat. Energy Res. Co. v. Upper Gunnison River Water Conservancy Dist.*, 142 P.3d 1265, 1280 (Colo. 2006).

27

An issue is "actually litigated" if it was raised and contested by the parties in the prior action. *Id.*

¶ 71    Stepmother rests her issue preclusion argument on *Bristol Bay Productions, LLC v. Lampack,* 2013 CO 60, 312 P.3d 1155. But the facts in that case were materially different from those presented here. *Bristol Bay* involved two lawsuits — one that went to verdict in California and another in Colorado that was filed during the California trial. *See id.* at ¶¶ 8-11, 312 P.3d at 1157-58. Both cases were based on identical fraud allegations — that an author misrepresented his readership figures. *See id.* at ¶¶ 1-2, 8-11, 312 P.3d at 1156-58.

¶ 72    The defendants in the Colorado case argued that the claims were barred by issue preclusion. *See id.* at ¶¶ 12-14, 18, 312 P.3d at 1158-59. The Colorado plaintiff responded that the presence of different defendants in the two cases alone precluded the application of issue preclusion. *See id.* at ¶¶ 18, 30, 312 P.3d at 1159, 1161. The plaintiff's "preclusion argument was not based on any perceived difference in the substance of the misrepresentations themselves but was instead based solely on the fact that its

allegations were directed at different defendants." *Id.* at ¶ 30, 312 P.3d at 1161.

¶ 73     The supreme court concluded that, when two cases rest on the same alleged misrepresentations and resulting damages, the fact that the allegations are directed at different defendants does not, by itself, defeat the application of issue preclusion. *See id.* at ¶¶ 29, 34-38, 312 P.3d at 1161-63. Factual differences between the cases will defeat the application of issue preclusion only if those differences change the issue. *See id.* at ¶ 24, 312 P.3d at 1160. "[T]he question is whether the change in facts matters in light of the elements needed to prove" the party's claims in the second case. *Id.* In *Bristol Bay*, the identity of the defendants in the Colorado action was not relevant to the causation element of the plaintiff's fraud claims; because the alleged misrepresentations, the plaintiff's reliance on such misrepresentations, and the plaintiff's claimed damages were the same in both actions, the relevant facts were identical despite the presence of different defendants. *See id.* at ¶¶ 29-31, 34, 312 P.3d at 1161-62.

¶ 74     *Bristol Bay* demonstrates that the trial court correctly concluded in this case that issue preclusion did not apply to

29

mother's claims against stepmother because stepmother's conduct was "neither actually litigated nor necessarily decided" in the domestic relations case. Indeed, no pleading, claim, or submission in the domestic relations case required the court to consider stepmother's conduct, and the domestic relations court made no findings concerning stepmother. And the disputed issues regarding stepmother's actions were neither argued nor litigated in the domestic relations case.

¶ 75 Thus, because stepmother could not satisfy the identity-of-facts requirement necessary for issue preclusion, *see Nat. Energy Res. Co.*, 142 P.3d at 1280, the trial court properly denied stepmother's preclusion argument.

### C. The Trial Court Properly Entered Judgment Against Stepmother on Mother's Conspiracy Claim

¶ 76 Stepmother argues that mother's civil conspiracy claim fails because, in her view, the predicate outrageous conduct claim is barred by section 19-3-309 and by issue preclusion. But as explained above, stepmother was entitled to neither section 19-3-309 immunity nor the protection of issue preclusion. Thus, there is no basis for disturbing the jury's conspiracy verdict.

### D. The Trial Court Did Not Err by Awarding Noneconomic Damages Above the Statutory Cap in Favor of Mother and Against Stepmother

#### 1. Standard of Review

¶ 77    "To the extent that our review requires us to interpret the Colorado Rules of Civil Procedure, we proceed under a de novo standard of review." *DCP Midstream, LP v. Anadarko Petroleum Corp.*, 2013 CO 36, ¶ 24, 303 P.3d 1187, 1193. "We construe [the Rules] liberally to effectuate their objective to secure the just, speedy, and inexpensive determination of every case and their truth-seeking purpose." *Id.*

#### 2. Section 13-21-102.5, C.R.S. 2025

¶ 78    Colorado law caps damages for noneconomic loss or injury. Section 13-21-102.5(3)(a)(I) states, as relevant here, that in any civil action "in which damages for noneconomic loss or injury may be awarded, the total of such damages shall not exceed the sum of [$250,000], unless the court finds justification by clear and convincing evidence therefor." The cap is periodically adjusted for inflation. *See* § 13-21-203.7, C.R.S. 2025.

¶ 79    For claims that accrued before January 1, 2020, the adjusted noneconomic damages cap was $468,010, which could be increased

up to $936,030 if the court found justification by clear and convincing evidence. *See* Colorado Secretary of State, Certificate (Jan. 27, 2026), https://perma.cc/Z2RF-NKW6. For claims accruing on or after January 1, 2020, and before January 1, 2022, the adjusted cap was $613,760, with a maximum of $1,227,530. *See id.* (The statute thus contains two caps — the cap on jury awards of noneconomic damages, which a court can exceed based on a finding of clear and convincing evidence, and the absolute cap.)

¶ 80 We review the trial court's application of the statutory caps for an abuse of discretion. *Pisano v. Manning*, 2022 COA 22, ¶ 19, 510 P.3d 572, 576.

### 3. Mother's Claims Accrued in 2020 and Thus Fall Outside the Pre-2020 Damages Cap

¶ 81 "[A] cause of action for injury to person, property, reputation, possession, relationship, or status shall be considered to accrue on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence." § 13-80-108(1), C.R.S. 2025. A cause of action's accrual date determines the amount of the noneconomic damages cap because it

is adjusted for inflation.  *See* § 13-21-102.5(3)(c)(I)(A); Colorado Secretary of State, Certificate (Jan. 27, 2026).  Thus, different accrual periods have different caps.  *See* Colorado Secretary of State, Certificate (Jan. 27, 2026).  Stepmother argues that the claims accrued in 2019.  We disagree.

¶ 82     As noted above, the accrual date of mother's claims against stepmother hinges on when mother knew or should have known of stepmother's conduct, not when the conduct occurred.  *See* § 13-80-108(1).

¶ 83     Mother testified that she first learned the extent of stepmother's involvement in the child abuse allegations in January 2020, when mother reviewed the video recordings of J.1.H.'s September 2019 forensic interview.  Stepmother did not identify any evidence indicating that, before January 2020, mother knew, or could have known, the extent of stepmother's involvement.

¶ 84     In sum, the record supports the trial court's finding that, because mother did not discover the extent of stepmother's involvement until January 2020, her claims against stepmother accrued at that time.  And that timing determines which cap applies: claims accruing in 2020 are subject to the higher

post-January 1, 2020, noneconomic damages cap, rather than the lower pre-2020 cap.

### 4. The Trial Court Did Not Abuse Its Discretion by Awarding Noneconomic Damages Against Stepmother

¶ 85 The trial court found clear and convincing evidence for allowing the jury's $1,000,000 award to stand, citing

> the manifest importance of the family bond, the four years that [mother] has not meaningfully parented her children; the likely permanent loss of the parent-child relationship and the destruction of the family unit; the manifest gravity of the destruction of familial relationships; and the extraordinary circumstances presented by the facts of this case.

The evidence outlined in mother's post-trial motion supported this determination, including evidence that mother had no contact or relationship with the children during the relevant time period; the children did not know whether mother was alive or dead; father's and stepmother's allegations evolved; and within a single week, those allegations destroyed mother's family despite her previously strong relationship with the children.

¶ 86 Under the circumstances, the trial court did not abuse its discretion by awarding mother noneconomic damages against

stepmother because its ruling fell within the absolute cap and the range of reasonable outcomes. *See Pisano*, ¶¶ 37-38, 510 P.3d at 579. When determining whether an award above the jury award cap is warranted, the trial court may consider any factors it finds relevant. *See id.* at ¶¶ 28-29, 510 P.3d at 577. Such justification may arise from especially severe noneconomic injuries or from circumstances in which the policy considerations underlying the jury award cap do not apply. *See id.* Courts have "consistently relied on a case's exceptional circumstances to justify the decision to exceed the [jury award] cap." *Id.* at ¶ 30, 510 P.3d at 577-78.

¶ 87   The evidence of mother's profound, life-altering pain and suffering resulting from the loss of the love of and relationships with the children due to stepmother's misconduct provides ample justification for exceeding the jury award cap on noneconomic damages.

## III.   Disposition

¶ 88   The judgment is affirmed.

JUDGE YUN and JUDGE SCHUTZ concur.